UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

JAMES EDWARD MONTGOMERY,        )
                               )
                  Petitioner,   )
                               )
v.                             )        Case No. 17-CV-0445-CVE-JFJ
                               )
JAMES COTTON, Interim Warden,[1] )
                               )
                  Respondent.   )

<u>OPINION AND ORDER</u>

Petitioner James Edward Montgomery, a self-represented Oklahoma prisoner,[2] petitions

for a writ of habeas corpus, under 28 U.S.C. § 2254, asserting that he is unlawfully detained under

the criminal judgment entered against him in Tulsa County District Court Case No. CF-2007-4506.

He claims the judgment was obtained in violation of his Sixth Amendment right to counsel and

Fourteenth Amendment right to due process because:  (1) the State of Oklahoma ("the state") did

not present sufficient evidence at trial to establish his guilt beyond a reasonable doubt (claim one);

(2) the state presented evidence of a second prior felony conviction at trial, for purposes of seeking

an enhanced sentence, when the state neither alleged nor proved the existence of that prior

conviction at his preliminary hearing (claim two); (3) trial counsel provided constitutionally

deficient representation by (a) failing to obtain an expert witness who would have testified about

the effects of phencyclidine ("PCP") and (b) failing to object at trial to the admission of evidence

---

[1] Montgomery presently is imprisoned at the Jess Dunn Correctional Center in Taft, Oklahoma.  Dkt. # 52.  The Court therefore substitutes the interim warden of that facility, James Cotton, in place of Scott Crow as party respondent.  <u>See</u> Rule 2(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>.  The Clerk of Court shall note on the record this substitution.

[2] Because Montgomery appears without counsel, the Court liberally construes his petition and reply.  <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).

regarding the second prior felony conviction that was neither alleged nor proven at his preliminary hearing (claim three); (4) the prosecutor committed misconduct in closing argument by impermissibly shifting the burden of proof to Montgomery and depriving him of the presumption of innocence (claim four); and the trial court improperly responded to questions from the jury during deliberations (claim five).  Having considered the petition (Dkt. # 1), the response (Dkt. # 15), the reply (Dkt. # 20), the record of state court proceedings (Dkt. ## 15, 16, 17), and applicable law, the Court finds and concludes that Montgomery has not shown that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Court therefore denies the petition.

## *BACKGROUND*

### I.    **Pretrial proceedings**

In August 2007, the state charged Montgomery with maiming, in violation of OKLA. STAT. tit. 21, § 751 (count one); aggravated assault and battery, in violation of OKLA. STAT. tit. 21, § 646 (count two); resisting an officer, in violation of OKLA. STAT. tit. 21, § 268 (count three); and public intoxication, in violation of OKLA. STAT. tit. 37, § 8 (count four).  Dkt. # 16-10, at 17-18.[3]  The state alleged that Montgomery committed the felonies charged in counts one and two after former conviction of two felonies—specifically, (1) a federal conviction, "in U.S. District Court, Oklahoma, Case No. 03CR4," for possession of PCP and (2) a state conviction, in Tulsa County District Court Case No. CF-1999-6053, for possession of a controlled drug.  Id. at 19.

After the state presented its last witness at Montgomery's preliminary hearing, the state moved to admit two exhibits to support its allegation that Montgomery previously had been convicted of two felonies.  Dkt. # 16-1, at 36.  Trial counsel objected to the exhibit offered to

---

[3] For consistency, the Court's citations refer to the CM/ECF header pagination.

establish the prior federal conviction, asserting that it was "a judgment of revocation or something like that." Id. at 36-37. The presiding judge sustained the objection and did not admit the challenged exhibit, reasoning that it was "not a Judgment and Sentence." Id. at 37. The presiding judge then stated that the allegation of a prior federal conviction for possession of PCP would "be stricken" from the information. Id. The state asked for the preliminary hearing to be continued to that the state could obtain a "proper" judgment and sentence as to that conviction. Id. Over trial counsel's objection, the presiding judge granted the state an "extension through the end of the week to get a proper J&S from the federal courts." Id. at 38. After the state rested, trial counsel rested without calling any witnesses and entered a demurrer as to counts one and two. Id. The presiding judge found the evidence sufficient to support count one but insufficient to support count two and informed the state that it could amend count two to a charge of misdemeanor assault. Id. at 39. The state then gave notice of its intent to appeal the ruling as to count two. Id. The presiding judge set a hearing date for the state's appeal and bound Montgomery over for district court arraignment as to count one. Id. at 39-40. When the state asked for clarification as to when it should present the judgment and sentence to support the prior federal conviction alleged in the information, the presiding judge stated, "No, you're going to have to ask Judge Clancy to allow you to remand it for purposes of the second page." Id. at 40.

The state's appeal was denied, and Montgomery's case was remanded for a second preliminary hearing. Dkt. # 16-10, at 8. The docket entry regarding that hearing reflects that Montgomery was present, with trial counsel; that the court reporter was waived; that trial counsel objected "to [the] first paragraph of [the] second page"; that the presiding judge sustained the demurrer as to count two; that Montgomery waived the second preliminary hearing and further

time to plead; and that the presiding judge bound Montgomery over for district court arraignment. Id.

Two days after the second preliminary hearing, the state filed an amended information, charging Montgomery with maiming (count one), resisting an officer (count three), and public intoxication (count four), and showing that the charge of aggravated assault and battery (count two) was dismissed. Dkt. # 16-10, at 45-46. On the "second page" of the amended information, the state again alleged that Montgomery had two prior felony convictions, specifically, (1) a federal conviction, "in U.S. District Court, Oklahoma, Case No. 03-CR-004-001-P," for possession of firearm after former conviction of a felony; and (2) a state conviction, in Tulsa County District Court Case No. CF-1999-6053, for possession of a controlled drug. Id. at 47.

Three days later, trial counsel filed a motion to quash and demurrer, challenging the sufficiency of the evidence to establish probable cause as to the charge of maiming. Id. at 51-53. The motion did not challenge either prior felony conviction identified on the "second page" of the amended information. Id. Following a combined motion hearing and district court arraignment, the district court denied the motion to quash and the demurrer, entered a plea of not guilty on Montgomery's behalf, and set his case for trial. Dkt. # 16-3, at 1; Dkt. # 16-10, at 8.

## II.    Jury trial

Montgomery's case was tried to a jury in March 2008. Dkt. ## 16-5, 16-6. The following facts were established at trial. Between 1:30 and 2:00 a.m. on August 18, 2007, Glenn Dees and Zelba "Sandy" Richardson were standing near a sidewalk outside the Eastside Tag Agency near 19th and Garnett. Dkt. # 16-5, at 139-41, 206-07. Dees and Richardson, both of whom were newspaper carriers, were talking to each other as they waited to pick up newspapers for their delivery routes. Id. at 139-41, 206-07. Dees and Richardson saw a man, later identified as

Montgomery, running across the parking lot and down the sidewalk, moving toward them. Id. at 141, 207-08. According to Dees, Montgomery hit a wall, fell, got up, and "started kind of loping or trotting or whatever down the sidewalk." Id. at 141-42, 169. Richardson heard Montgomery "making noises," and Dees "couldn't tell whether [Montgomery] was hollering or singing." Id. at 141, 208.

As Montgomery approached the pair, Dees and Richardson moved away from each other so that Montgomery could pass between them and continue down the sidewalk. Id. at 142, 208. Montgomery did not continue down the sidewalk; he physically attacked Dees. According to Dees, Montgomery "just started swinging." Id. at 142, 166. Dees "backed up," heard Richardson scream, and saw Richardson lying on the ground. Id. Dees then turned back to face Montgomery, Montgomery "attacked" Dees, and Dees "went down" to the ground. Id. at 142-43, 166-67. Dees described the struggle that ensued:

> Well, after I went down, when I started to get back up, he started to kick me in the head and shoulders. And I grabbed one of his legs and yanked and he fell on top of me. And then he started hitting me on the back of the head with his arm and fist.
>
> And so I grabbed his arm that he was still on top of me, and when I grabbed his arm, I could see his hand coming down. And I could see the thumb coming towards my eye, but I could not, I couldn't stop it. I couldn't get out of the way and his thumb went into my eye.

Id. at 143. Fearing he had been "blinded," Dees grabbed Montgomery's arm and pushed it away, removing Montgomery's thumb from Dees's eye. Id. at 143-44. Montgomery responded by rolling over and biting Dees on the right side of his chest. Id. Dees repeatedly pounded on Montgomery and, after Montgomery "finally let loose," Dees ended up on top of Montgomery and held him down until help arrived. Id. Dees did not want to move, or to let Montgomery move, because Dees was "afraid . . . that [his] eyeball had been ripped out." Id.

5

Richardson heard Montgomery making "unintelligible sounds" and "grunting like a dog," and saw "spit coming out of his mouth," as Montgomery walked between her and Dees.  Id. at 200-09, 217-18.  Richardson saw Montgomery "double[] up his fist and hit" Dees, knocking Dees down to the ground.  Id. at 209.  Montgomery then "came at" Richardson, so she backed up, fell down, and screamed.  Id.  According to Richardson, Dees then reached out, grabbed Montgomery's leg, and pulled Montgomery to the ground.  Id.  While Dees struggled with Montgomery, Richardson retrieved her cell phone from her car and called 911.  Id. at 209-12.  A recording of the 911 call was played for the jury.  Id. at 213.  Richardson requested an ambulance because she saw that Dees was hurt—specifically, she thought she saw "his eyeball, and it was just the skin hanging down."  Id.

Eric Spradlin, a Tulsa police officer, and his partner responded to the 911 call at 19th and Garnett.  Dkt. # 16-6, at 5.  When they arrived, Dees was on top of Montgomery "in an apparent struggle."  Id.  The officers told Dees to get up, and Spradlin pulled Dees up and off Montgomery.  Id. at 5-6.  Spradlin noticed that Dees had an eye injury and Dees appeared to be in shock.  Id.  Richardson reported that Montgomery had attacked her and Dees, and the officers tried to arrest Montgomery.  Id. at 6.  According to Spradlin, Montgomery initially appeared "to be in a real calm state," then "went crazy and rolled over" when Spradlin placed one handcuff on him.  Id.  While Spradlin and his partner attempted to arrest Montgomery, Montgomery was "actively resisting, kicking at [them], [and] swinging at [them]."  Id. at 12, 14.  The officers used one burst of pepper spray to subdue Montgomery, but the spray "had no effect on him."  Id. at 12, 14-15.  Ultimately, "[i]t took about three or four [officers] to finally get [Montgomery] in cuffs."  Id. at 8, 13-14.  Based on his experience, Spradlin deduced that Montgomery had ingested some kind of "substance."  Id. at 15-16.  Todd Collins, one of the officers who arrived on scene after Spradlin,

heard Montgomery "babbling and screaming" while at least four officers tried to subdue him.  Id. at 17-18, 21.  Collins also observed that Montgomery "had severe nystagmus," or "small jerking motions," in his eyes, indicating that Montgomery, had been "drinking or taking some kind of medication or something."  Id. at 21-22.

The jury heard testimony about Dees's eye injury from Dees and from Gerard Hunter, M.D., an ophthalmologist who treated Dees.  Dees testified that he was transported to the emergency room immediately after the attack.  Dkt. # 16-5, at 146.  According to Dees, the skin near his left eye "had been torn down and was hanging down on [his] cheek," "all the tendons and muscles and everything had been ripped in two," including "the tear ducts," and emergency room personnel "patched [his eye] up the best they could."  Id. at 146-47, 150, 160; see also Dkt. # 16-7, at 2-3.  At that time, Dees had no vision in his left eye.  Dkt. # 16-5, at 147, 152.  Dees had three surgeries to repair his eye before trial, and he anticipated that he would need a fourth surgery.  Id. at 147, 151.  At the time of trial, he had "no peripheral vision to [his] left," he had vision in his left eye only if he looked straight ahead, and he would experience double or triple vision if he tried move his left eye.  Id. at 145.  Dees further testified that he experienced perception issues that interfered with going downstairs or upstairs, that his double vision interfered with or prevented him from reading, and that he had to use hot compresses each morning and several times during the day to open his eyelid.  Id. at 147-50.

Dr. Hunter testified that he examined Dees on August 28, 2007, ten days after Montgomery attacked Dees.  Id. at 186-87.  Dr. Hunter observed that Dees "had a large, partially-repaired laceration of his left lower lid that also extended into the inner portion of the eye socket, the area between his nose and his eye."  Id. at 187; see also Dkt. # 16-7, at 4-5.  Dr. Hunter testified that he performed surgery to reconstruct the tissues and tendons surrounding Dees's left eye and to

"reattach the tear drain system." Dkt. # 16-5, at 191-92. Because the lower tear drain system "was gone," Dr. Hunter could only partially reconstruct that system and he had to place "small silicone tubes" in the lower lid area "to facilitate tear drainage." Id. at 192. According to Dr. Hunter, Dees's injury was "not a laceration in the sense of you think of somebody being cut with a knife" and instead was "a blunt force tear by somebody inserting something, albeit their finger or whatever, and prying the tissue apart so that things were shredded more than they were cut." Id. at 192-93. Dr. Hunter opined that the blunt force trauma injury Dees suffered was not accidental. Id. at 197-98, 205. He testified that "[i]n the times that [he has] seen this type of injury, it has been exclusively limited to a way to disable an opponent in a way that hurts them so badly they will put up no further resistance." Id. at 198. Dr. Hunter testified that he was referring to eye "gouging" and further testified that Dees's injury was consistent with gouging because "all of this tore from the inner corner of the eye and lids out to the outer corner." Id. at 198-99, 204. Dr. Hunter opined that the most significant impairment resulting from Dees's injury would be "his persistent double vision." Id. at 196.

After the state rested, trial counsel entered a general demurrer as to all three charges. Dkt. # 16-6, at 24. As to the charge of maiming, trial counsel argued the evidence was not sufficient to show intent. Id. The trial court overruled the demurrer. Id. at 25-26.

Montgomery was the only defense witness. Montgomery testified that he smoked two marijuana joints dipped in PCP between approximately 8:00 p.m. on August 17, 2007, and 12:30 a.m. on August 18, 2007. Dkt. # 16-6, at 35-37, 45-52. Around 12:30 p.m. or 1:00 a.m., Montgomery and his cousin, Rick, went to a club near 21st and Garnett in Tulsa. Id. at 51-52. Montgomery smoked a third marijuana joint dipped in PCP just before entering the club. Id. Montgomery recalled that he went inside the club, that he got an energy drink, and that he danced

with two females.  Id. at 52-53.  Montgomery also recalled the outfit he wore to the club and that he wore "white Nikes."  Id. at 49.  Montgomery did not recall leaving the club, but he did recall waking up in an ambulance and, later, waking up in a hospital.  Id. at 37-38, 53-54.  On cross-examination, Montgomery testified that he had "been smoking marijuana and PCP for years," and that he had three prior felony convictions.  Id. at 41-42.  Montgomery maintained that he did not remember attacking Dees and Richardson.  Id. at 43, 54.

Relevant to the charge of maiming, the jury was instructed that, to obtain a conviction, the state must prove, beyond a reasonable doubt:  (1) infliction, (2) upon another; (3) of a physical injury that disables/disfigures; (4) performed with the intent to cause any injury.  Dkt. # 16-10, at 119.  The jury also was instructed that "the crime of [m]aiming has an element of specific intent to cause any injury," and that "[a] person is entitled to the defense of voluntary intoxication if that person was incapable of forming the specific criminal intent because of his intoxication."  Id. at 122.  Another jury instruction defined the phrase "incapable of forming specific criminal intent" as "[t]he state in which one's mental powers have been overcome through intoxication, rendering it impossible to form a criminal intent," and defined the term "intoxication" as "[a] state in which a person is so far under the influence of an intoxicating liquor/drug to such an extent that his judgment is impaired."  Id. at 125.  The jury also was instructed that the elements of the lesser included offense of aggravated assault and battery require the state to prove:  (1) an assault and battery (2) upon another person (3) by inflicting great bodily injury.  Id. at 126.  During jury deliberations, the jury sent a note asking the trial court to "define intent."  Dkt. # 16-7, at 11.  The trial court responded, in writing, "You have all the law and evidence necessary to reach a verdict."  Id.  Nothing in the record indicates that the trial court consulted with the parties before it answered this question or that the trial court brought the jury into the courtroom before providing the written

response.  Dkt. # 16-6, at 91-92.  At the conclusion of the first stage of Montgomery's bifurcated trial, the jury found Montgomery guilty as to maiming, resisting an officer, and public intoxication. Id. at 92-93; Dkt. # 15-5, at 1.

During the second stage of Montgomery's bifurcated trial, the state presented two exhibits showing that Montgomery previously had been convicted (1) of possession of a firearm after former conviction of a felony, in Case No. 03-CR-04-001-P, and (2) of unlawful possession of a controlled drug, in Case No. CF-99-6053.  Id. at 97; Dkt. # 16-7, at 6-10.  Trial counsel did not object to the admission of either exhibit or to the second stage jury instruction referring to these prior convictions.  Dkt. # 16-6, at 97-104.  The jury found that Montgomery had two prior felony convictions and recommended a sixty-year prison term for maiming, a one-year prison term for resisting an officer, and a thirty-day jail term for public intoxication.  Id. at 106-07; Dkt. # 15-5, at 1.  The trial court sentenced Montgomery according to the jury's recommendations.  Dkt. # 16-8, at 7-8.

## III.    Direct appeal

Montgomery filed a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), asserting seven claims.  Dkt. # 15-1, at 2-3; Dkt. # 15-5, at 1-2.  The OCCA remanded the case to the state district court for an evidentiary hearing on Montgomery's claim that trial counsel provided constitutionally deficient representation, in part, by failing to call an expert witness to testify about the effects of PCP.  Dkt. # 16-9, at 3.  The state district court heard testimony from two witnesses:  Richard Couch, Montgomery's trial counsel; and David Wallace, Ph. D., a professor of pharmacology with an emphasis in neuroscience and toxicology.  Dkt. # 16-9. Following the evidentiary hearing, the trial court submitted written findings of fact and conclusions

of law to the OCCA.  Dkt. # 15-3.  The OCCA denied relief as to all seven claims and affirmed Montgomery's judgment and sentence in March 2010.  Dkt. # 15-5.

## IV.    Federal habeas proceeding

Montgomery filed the instant petition in 2017, raising five of the seven claims that he presented to the OCCA through his direct appeal.[4]  Dkt. # 1, at 7-35. Respondent urges the Court to deny the petition, primarily asserting that 28 U.S.C. § 2254(d) bars relief.  Dkt. # 15. Respondent also contends that some claims allege only errors of state law and thus do not present claims on which relief could be granted under 28 U.S.C. § 2254(a).[5]  Id.

## *DISCUSSION*

A federal court has discretion to issue a writ of habeas corpus to a state prisoner who demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); see Wilson v. Corcoran, 562 U.S. 1, 5 (2010) ("[I]t is only

---

[4] In 2020, this Court granted Montgomery's request to stay this habeas proceeding so that he could file a second application for postconviction relief to exhaust a new claim based on McGirt v. Oklahoma, 591 U.S. 894 (2020).  Dkt. # 26.  The state district court granted Montgomery's second application for postconviction relief, the state filed a postconviction appeal, and the OCCA reversed the grant of postconviction relief based on State ex rel. Matloff v. Wallace, 497 P.3d 686 (Okla. Crim. App. 2021), and remanded the case to the state district court for further proceedings Dkt. # 50, at 3-4.  Pursuant to the OCCA's mandate, the state district court denied Montgomery's second application for postconviction relief.  Id. at 4.  In 2022, this Court denied Montgomery's request to amend the petition to add the McGirt claim that he presented to the OCCA through his second postconviction appeal, lifted the stay, and granted Montgomery's request to reopen this case.  Id. at 11.

[5] A state prisoner ordinarily has only one year from the date his or her judgment becomes final at the conclusion of direct review to file a timely habeas petition. 28 U.S.C. § 2244(d)(1)(A). That time is tolled, however, during the time an application for postconviction relief is pending in state court. 28 U.S.C. § 2244(d)(2).  Montgomery's conviction became final in June 2010.  Dkt. # 50, at 6, n.6.  He filed an application for postconviction relief in March 2011 and that application was pending until May 2017 when the OCCA affirmed the state district court's order denying postconviction relief.  Id.  Respondent concedes that Montgomery's claims are timely and that he exhausted available state remedies as required by 28 U.S.C. § 2254(b)(1)(A).  Dkt. # 15, at 2.

noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). However, because Montgomery seeks federal habeas relief as to five of the seven claims that he presented to the OCCA on direct appeal, and the OCCA adjudicated each of those claims on the merits, 28 U.S.C. § 2254(d) guides, and limits, this Court's review of those claims.

Under § 2254(d), a federal habeas court may not grant relief to a state prisoner unless the prisoner first shows that the state court's adjudication of his federal claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[6] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). Regardless of whether the prisoner challenges either the legal underpinnings of the state court's decision, under § 2254(d)(1), or the factual underpinnings of the state court's decision, under § 2254(d)(2), the prisoner must show that no fairminded jurist would agree with the state court's decision. See Mays v. Hines, 592 U.S. 385, 391 (2021) ("Because a Tennessee court considered and rejected [the petitioner's] theory, a federal court 'shall not' grant a writ of habeas corpus unless the earlier decision took an 'unreasonable' view of the facts or law." (quoting 28 U.S.C. § 2254(d))); Dunn v. Madison, 583 U.S. 10, 12 (2017) ("A habeas petitioner meets [§ 2254(d)'s] demanding standard only when he shows that the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

---

[6] As used in § 2254(d)(1), the phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). Because the OCCA issued its decision in 2010, this Court must consider the OCCA's decision in light of federal law that was clearly established as of 2010.

disagreement.'" (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)); Richter, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); Renico v. Lett, 559 U.S. 766, 779 (2010) (noting that § 2254(d) "prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts").

Further, even if a prisoner satisfies § 2254(d)'s preconditions to relief, the prisoner also must "persuade a federal habeas court that 'law and justice require' relief." Brown v. Davenport, 596 U.S. 118, 134 (2022) (quoting 28 U.S.C. § 2243). Thus, to grant relief to a prisoner who has shown that the state court unreasonably rejected the prisoner's claim that a constitutional error occurred at his or her trial, a federal habeas court must apply Brecht v. Abrahamson, 507 U.S. 619 (1993), to determine whether the constitutional error "had a substantial and injurious effect or influence" on the outcome of the prisoner's trial. Davenport, 596 U.S. at 122, 126, 134; see also id. at 122 ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in Brecht and the one Congress prescribed in AEDPA.").

With these standards in mind, the Court turns to Montgomery's claims.

## I.    Claim one:  sufficiency of the evidence

Montgomery claims that the state failed to prove, beyond a reasonable doubt, that he committed the crime of maiming. Dkt. # 1, at 7-11; Dkt. # 20, at 1-3. The Fourteenth Amendment's Due Process Clause guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson

v. Virginia, 443 U.S. 307, 316 (1979); see In re Winship, 397 U.S. 358, 364 (1970) (holding "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). Under Jackson, the question for a court reviewing a challenge to the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. On direct review, a state appellate court "may set aside the jury's verdict . . . only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (citing Jackson). On habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. (quoting Renico, 559 U.S. at 773). A federal court begins its evaluation of the reasonableness of the state court's decision by "look[ing] to state law for 'the substantive elements of the criminal offense.'" Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 324 n.16). "[B]ut the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Id.

Oklahoma law provides that "[e]very person who, with premeditated design to injure another, inflicts upon his person any injury which disfigures his personal appearance or disables any member or organ of his body or seriously diminishes his physical vigor, is guilty of maiming." OKLA. STAT. tit. 21, § 751 (2001). "A design to injure, disfigure, or disable, is inferred from the fact of inflicting an injury which is calculated to disfigure or disable, unless the circumstances raise a reasonable doubt whether such design existed." OKLA. STAT. tit. 21, § 756 (2001). "A premeditated design to injure, disfigure or disable, sufficient to constitute maiming, may be formed

instantly before inflicting the wound."  OKLA. STAT. tit. 21, § 757 (2001).  The OCCA has explained that,

> [i]n a prosecution for maiming . . . a "premeditated design to injure another" does not mean that there must be a design to maim the person injured in the exact way or to the extent actually perpetrated.  Premeditated design is an element of the offense, but the design may be shown by proving a battery deliberately committed in a cruel way, or by methods or means likely to result in physical injury to the person assailed, though without an intent to inflict the particular injury sustained.

De Arman v. State, 242 P. 783, 783 (Okla. Crim. App. 1926) (citing White v. State, 210 P. 313 (Okla. Crim. App. 1922)).  Pursuant to Oklahoma law, the jury was instructed that the state had to prove, beyond a reasonable doubt, that Montgomery (1) inflicted, (2) upon another (3) a physical injury that disabled or disfigured, (4) with the intent to cause any injury.  See Oklahoma Uniform Jury Instructions-Criminal ("OUJI-CR") 4-116 (listing elements of maiming); Dkt. # 16-10, at 119 (Jury Instruction No. 22).

Montgomery argues, as he did on direct appeal, that the state failed to establish his specific intent to cause injury.[7] Dkt. # 1, at 8-11; Dkt. # 15-1, at 12-15. The OCCA rejected this argument, concluding that "[a] rational jury could find from the evidence presented at trial that the injury inflicted by Montgomery on the victim was calculated and committed with an intent to injure." Dkt. # 15-5, at 2. Montgomery contends the OCCA's decision "is contrary to clearly established Federal law resulting in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court." Dkt. # 1, at 7, 11; Dkt. # 20 at 1-3. The Court disagrees.

First, the OCCA's decision is not contrary to clearly established federal law. A state court's decision is "contrary to" Supreme Court precedent only if the state court "applie[d] a rule that contradicts" that precedent or the state court "confront[ed] a set of facts that are materially

---

[7] Montgomery appears to argue, in part, that the jury could not properly assess the evidence because the trial court refused to define "intent" in response to the jury's request, during jury deliberations, for a definition of intent. Dkt. # 1, at 10. But whether the jury was properly instructed on the element of "intent" is a separate issue. The <u>Jackson</u> standard requires the reviewing court to view the evidence presented at trial in the state's favor and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. The jury was instructed on the essential elements of maiming, including "the intent to cause any injury," and that it had to find, beyond a reasonable doubt, that the State presented proof of each element. Dkt. # 16-10, at 119. In addition, the jury was instructed that that "the crime of [m]aiming has an element of specific intent to cause any injury," and that "[a] person is entitled to the defense of voluntary intoxication if that person was incapable of forming the specific criminal intent because of his intoxication." <u>Id.</u> at 122. Another jury instruction defined the phrase "incapable of forming specific criminal intent" as "[t]he state in which one's mental powers have been overcome through intoxication, rendering it impossible to form a criminal intent," and defined the term "intoxication" as "[a] state in which a person is so far under the influence of an intoxicating liquor/drug to such an extent that his judgment is impaired." <u>Id.</u> at 125. On this record, the trial court likely was justified in advising the jury it had all the law it needed to continue deliberations. Regardless, claim one challenges the sufficiency of the evidence, not the sufficiency of jury instructions. And, as discussed next, the OCCA reasonably determined that any rational juror could have found, based on the evidence presented at trial, that the state established the essential elements of maiming beyond a reasonable doubt.

indistinguishable from" the facts in controlling Supreme Court precedent and reached a different result than that precedent. House v. Hatch, 527 F.3d 1010, 1018 (10th Cir. 2008). The OCCA identified the Jackson standard when it evaluated his claim. Dkt. # 15-5, at 2. And Montgomery has not shown that the OCCA's decision reached a different result than any Supreme Court precedent involving evaluation of a materially indistinguishable set of facts.

Second, the OCCA's decision is not based on an unreasonable determination of the facts presented in state court. A state court decision may be based on an unreasonable determination of the facts if the prisoner shows that the "state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting Byrd v. Workman, 645 F.3d 1159, 1170-72 (10th Cir. 2011)). Montgomery discusses the evidence that was presented at trial and asserts that the OCCA's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." Dkt. # 1, at 7-11; Dkt. # 20, at 1-3. Montgomery emphatically disagrees with the OCCA's evaluation of the sufficiency of the evidence, but he has not shown that the OCCA misstated or misapprehended the facts that were presented in state court. Id. It is his burden to do so. See Hancock v. Trammell, 798 F.3d 1002, 1012 (10th Cir. 2015). Instead, Montgomery effectively asks this Court to view the evidence in his favor, to reweigh that evidence, and to substitute its own judgment for that of the jury and the OCCA. But that is not how either the Jackson standard or § 2254(d)(2) works. Having reviewed the evidence presented at trial, this Court finds that the OCCA's decision is not based on an unreasonable determination of the facts presented in state court.

Third, to the extent Montgomery may be arguing that the OCCA's application of the Jackson standard is objectively unreasonable, the record does not support that argument. A state

court's decision unreasonably applies Supreme Court precedent when it identifies the correct controlling precedent but applies that precedent to the facts of the case in an "objectively unreasonable" manner. Lockyer v. Andrade, 538 U.S. 63, 75 (2003). Montgomery essentially argues that the evidence was not sufficient to establish intent because the jury heard testimony that Montgomery was intoxicated and that he could not recall attacking Dees. Dkt. # 1, at 8-11; Dkt. # 20, at 1-3. But the OCCA reasonably applied Jackson when it rejected this argument because Jackson requires the reviewing court to view all the evidence in the light most favorable to the state and "to accept the jury's resolution of the evidence as long as it is within the bounds of reason." Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993). The jury heard evidence from Montgomery and other witnesses to support that Montgomery was intoxicated when he attacked Dees. And Montgomery testified that he did not intend to injure Dees. But, in accordance with Oklahoma law, the jury was instructed that voluntary intoxication was a defense to the crime of maiming only if the evidence showed that Montgomery "was incapable of forming the specific criminal intent because of his intoxication." Dkt. # 16-10, at 122. Another jury instruction defined the phrase "incapable of forming specific criminal intent" as "[t]he state in which one's mental powers have been overcome through intoxication, rendering it impossible to form a criminal intent," and defined the term "intoxication" as "[a] state in which a person is so far under the influence of an intoxicating liquor/drug to such an extent that his judgment is impaired." Id. at 125. As evidenced by its guilty verdict as to the charge of public intoxication, the jury found that Montgomery was intoxicated when he attacked Dees. But the jury rejected Montgomery's theory of defense—namely, that he was so intoxicated that he could not form the intent to injure Dees. Notably, the jury heard evidence that Montgomery recalled details of the events immediately preceding the attack and recalled waking up in an ambulance shortly after the attack. In addition,

the jury heard evidence from Dr. Hunter that Dees's injury was consistent with intentional eye gouging, not an accidental jab.  Considering the evidence presented at trial, viewing that evidence in the light most favorable to the state, and giving due deference to the OCCA's decision, the Court finds that the OCCA's application of the Jackson standard was objectively reasonable.

For these reasons, § 2254(d) bars relief, and the Court denies the petition as to claim one.

## II.     Claim two:  due process violation based on evidence of prior felony conviction

Montgomery claims that he was denied his Fourteenth Amendment right to procedural due process "when a second felony was presented to the jury that had not been alleged or proven at preliminary hearing." Dkt. # 1, at 11-14; Dkt. # 20, at 4.[8]  Relying solely on state law, Montgomery presented a similar claim to the OCCA on direct appeal.  See Dkt. # 15-1, at 22-24 (citing and discussing Carter v. State, 292 P.2d 435 (Okla. Crim. App. 1956), for the proposition that an allegation of a prior conviction must be alleged and proven at the defendant's preliminary hearing). The OCCA construed Montgomery's claim as asserting that his "sentence was improperly enhanced with two prior felony convictions." Dkt. # 15-5, at 2.  Applying state law, the OCCA rejected Montgomery's claim, reasoning:

> The record shows that Montgomery was bound over on his prior state conviction at the original preliminary hearing in this case.  The docket entries and subsequent proceedings lead us to conclude that Montgomery was bound over on his prior federal conviction when his case was remanded for further preliminary hearing. Even if we were to find the record insufficient to show that Montgomery was bound over on his prior federal conviction, Montgomery's failure to object at trial and entry of a plea at district court arraignment waived any error.  Berry v. State, 1992 OK CR 41, ¶ 9, 834 P.2d 1002, 1005.

Id. at 3-4 (footnote omitted).  The OCCA further discussed the facts relevant to this claim:

---

[8] Montgomery also suggests that a Fourth Amendment violation occurred based on these facts.  Dkt. # 1, at 11.  But the Fourth Amendment prohibits unreasonable searches and seizures; it has no application to the circumstances Montgomery describes.  U.S. Const., amend. IV.

> Montgomery waived a court reporter at this second preliminary hearing. The docket sheet entry reflects that Montgomery objected to his prior federal conviction, but does [not] reflect the court's ruling on Montgomery's objection. After noting Montgomery's objection, the entry states that Montgomery waived preliminary hearing and further time to plead and the matter was set for district court arraignment. Montgomery never challenged his federal conviction after this hearing.

Id. at 4 n.3.

Respondent contends that this claim should be denied because it alleges an only error of state law. Dkt. # 15, at 14-17; see Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). The Court agrees. To the extent Montgomery claims that the state did not comply with any state law requirement that a prior conviction must be alleged and proven at a preliminary hearing, Montgomery alleges only an error of state law. See Patterson v. Gray, No. 20-3872, 2020 WL 6778410 (6th Cir. Nov. 9, 2020) (unpublished)[9] (noting that, in rejecting habeas petitioner's claim "that he was denied a preliminary hearing, in violation of due process," the federal district court "correctly pointed out that there is no federal constitutional right to a preliminary hearing"; and concluding that "[j]urists of reason therefore could not debate the district court's conclusion that" the habeas petitioner's claim "was not cognizable on federal habeas review"); Simmons v. Zavares, 325 F. App'x 652, 654 n.2 (10th Cir. 2009) ("Violation of Colorado procedures relating to preliminary hearings is not a basis for federal habeas relief." (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991))); Sullivan v. Bruce, 44 F. App'x 913, 916 (10th Cir. 2002) (concluding that "no constitutional violations arose in connection with [the petitioner's] pretrial proceedings"; and reasoning, in part, that the petitioner's "attack on the technical validity of the preliminary hearing became harmless error and

---

[9] The Court cites all unpublished decisions herein as persuasive authority. FED. R. APP. P. 32.1; 10th Cir. R. 32.1.

unreviewable after the jury found him guilty after trial"); Snow v. Oklahoma, 489 F.2d 278, 279 (10th Cir. 1973) ("There is no federal constitutional right to a preliminary hearing.").  Likewise, to the extent Montgomery claims that the evidence presented at the preliminary hearing was not sufficient to prove that he had two prior felony convictions, Montgomery alleges only an error of state law.  See Dretke v. Haley, 541 U.S. 386, 395 (2004) (explaining that the "constitutional hook in Jackson for constitutional claims challenging the sufficiency of the evidence was the holding in Winship and stating, "[w]e have not extended Winship's protections to proof of prior convictions used to support recidivist enhancements"); Powers v. Dinwiddie, 324 F. App'x 702, 704 (10th Cir. 2009) (reasoning that because the habeas petitioner "was ultimately convicted, his claim regarding the sufficiency of the evidence at his preliminary hearing cannot be grounds for habeas relief").

Alternatively, even if the Court could construe Montgomery's claim as alleging a denial of his Fourteenth Amendment right to due process, he has not shown that federal habeas relief is warranted.  Montgomery appears to argue that the state violated his right to due process because it did not allege or prove a federal conviction at the second preliminary hearing and, instead, merely "altered" the second page when it filed the amended information and added a different federal conviction without proving that conviction at the second preliminary hearing.  Dkt. # 1, at 12-13. He also asserts that he "did not waive preliminary examination of the federal conviction."  Id. at 13.  Montgomery contends that the OCCA's decision rejecting his due process claim therefore is "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  Dkt. # 1, at 11-13.  Having reviewed the record of relevant state court proceedings, the Court finds that the record fully supports the OCCA's understanding of the facts. Because a court reporter was waived for Montgomery's second preliminary hearing, the OCCA necessarily relied on the text entry in the state court docket sheet, and reasonable inferences drawn

therefrom, to determine what occurred at that hearing.  As the OCCA found, that text entry reflects that Montgomery was present at the hearing, with trial counsel; that trial counsel objected "to [the] first paragraph of [the] second page," most likely the new federal conviction alleged by the state; that the presiding judge did not indicate any ruling as to that objection; that the presiding judge sustained trial counsel's demurrer as to count two; that Montgomery waived the second preliminary hearing and further time to plead; and that the presiding judge bound Montgomery over to the district court for arraignment.  Dkt. # 15-5, at 3-4 & n.3; Dkt. # 16-10, at 8.  On this record, it was reasonable for the OCCA to determine that "that Montgomery was bound over on his prior federal conviction when his case was remanded for further preliminary hearing."  Id.

Further, assuming the OCCA had understood this claim as one asserting a federal due process violation, it would have been objectively reasonable for the OCCA to conclude that the alleged defect in the preliminary hearing process did not deprive Montgomery of his right to due process.  The "due process test" requires a reviewing court to determine whether the complained-of error violated "fundamental fairness."  Dowling v. United States, 493 U.S. 342, 352 (1990). And the Supreme Court "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly."  Id.  As the OCCA reasoned, even if an error occurred before trial regarding the federal conviction alleged in the amended information, Montgomery did not object at trial to the presentation of evidence regarding the prior federal conviction, and the jury found beyond a reasonable doubt that Montgomery had two prior felony convictions.  See, e.g., Sullivan, 44 F. App'x at 916 (concluding that "no constitutional violations arose in connection with [the petitioner's] pretrial proceedings"; and reasoning, in part, that the petitioner's "attack on the technical validity of the preliminary hearing became harmless error and unreviewable after the jury found him guilty after trial").  Thus, even if the Court generously construes claim two as

sufficiently stating a federal due process claim, § 2254(d) bars relief because Montgomery has not shown that the OCCA's decision rejecting that claim is based on an unreasonable determination of the facts presented in state court or an unreasonable application of the fundamental fairness inquiry that governs a federal due process claim.

For these reasons, the Court denies the petition as to claim two.

## III.    Claim three:  ineffective assistance of trial counsel

Montgomery claims that he was denied his Sixth and Fourteenth Amendment rights to the effective assistance of trial counsel.  Dkt. # 1, at 14-27.  "[T]he Sixth Amendment right to counsel includes a right to effective representation."  Frost v. Pryor, 749 F.3d 1212, 1224 (10th Cir. 2014); see Strickland v. Washington, 466 U.S. 668, 686 (1984).  Strickland establishes a two-prong analysis for evaluating ineffective assistance of counsel claims that requires a defendant to show deficient performance and resulting prejudice.  466 U.S. at 687, 694.  Because "[t]here are countless ways to provide effective assistance in any given case," a defendant alleging deficient performance must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 688-89.  In addition, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  To establish resulting prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

Montgomery presented this claim to the OCCA, asserting that trial counsel provided constitutionally deficient performance by:  (1) failing to present an expert witness to testify about the effects of PCP; and (2) failing to object at trial when the state sought enhancement of his sentence based on two prior felony convictions, one of which was not proven at a preliminary

hearing.  Dkt. # 15-1, at 25-31.  Applying <u>Strickland</u>, the OCCA determined that Montgomery

failed to show that either allegation supported a finding that trial counsel was ineffective.  Dkt. #

15-5, at 4.  As to the failure to call an expert witness, the OCCA reasoned that the record supported

the state district court's factual findings that were made following the evidentiary hearing.  <u>Id.</u>; <u>see</u>

Dkt. # 15-3 (state district court's written findings of fact and conclusions of law).  Referring to

those findings, the OCCA stated:

> Trial counsel explained that his decision not to call an expert stemmed from the
> concern that an expert could detract from his attempt to humanize Montgomery
> through the lay witnesses's description of Montgomery's behavior.   Counsel
> discussed this strategy with Montgomery who agreed with the strategy.  Under
> these circumstances, Montgomery has failed to overcome the presumption that the
> challenged action could not be considered sound trial strategy.

Dkt. # 15-5, at 5.  As to trial counsel's failure to object to the admission of Montgomery's prior

federal conviction, the OCCA reasoned that trial counsel was not ineffective because, as the OCCA

had previously determined, "the record supports a finding that Montgomery was bound over on

this prior conviction at the second preliminary hearing."  <u>Id.</u>  Montgomery contends that the

OCCA's decision is based on an unreasonable application of <u>Strickland</u> and an unreasonable

determination of the facts.  Dkt # 1, at 14-27; Dkt. # 20, at 5-10.  For two reasons, the Court

disagrees.

First, the OCCA considered Montgomery's allegations of ineffective assistance only after

remanding his case for an evidentiary hearing on his claim regarding trial counsel's failure to call

an expert witness.  The state district court heard testimony from two witnesses:  Richard Couch,

Montgomery's trial counsel; and David Wallace, a professor of pharmacology.  Dkt. ## 15-3, 16-

9.  After hearing testimony from both witnesses, the state district court found, in part:  (1) that Dr.

Wallace reviewed trial testimony, arrest records, medical records and the 911 call and opined that

Montgomery's "irrational behavior, excessive violence, inability to follow commands, lack of

response to a painful stimulus are all consistent with Phencyclidine (PCP) intoxication; (2) that "[n]o confirmatory test to determine the level of PCP in [Montgomery's] system, if any, at the time of the alleged incident was available to Dr. Wallace"; and (3) that Dr. Wallace had no opinion as to whether Montgomery would have been able to "form specific intent while under the influence of PCP." Dkt. # 15-3, at 1-2. Relevant to trial counsel's decision not to call an expert witness, the state district court further found that Couch: (1) settled on theory of defense that Montgomery "had no intent to cause any type of maiming" because he "was high on PCP"; (2) wanted to show the jury that Montgomery "was remorseful" and wanted to avoid "cast[ing] any blame on the two paper carriers"; (3) worked on a case a few months before Montgomery's trial that involved first degree murder and a defendant who used PCP and, in that prior case, Couch "consulted with Steve Stewart, a drug court evaluator about the effects of PCP"; (4) "decided that the lay witnesses gave the best explanation of [Montgomery's] behavior"; (5) "decided not to call an expert, as the behavior of [Montgomery] was the best evidence" of his inability to form specific intent; and (6) "discussed the defense strategy with [Montgomery] and [determined Montgomery] was in

agreement." Id. at 2.[10]  Having reviewed the transcript from the evidentiary hearing, the Court

agrees with the OCCA that the state district court's factual findings accurately represent the

testimony from that hearing.  See Dkt. # 16-9.  Further, as previously discussed, the record fully

supports the OCCA's understanding of the facts relevant to the allegation of ineffectiveness arising

from the prior federal conviction that was used to enhance Montgomery's sentence.  See supra,

discussion section II.  The Court thus finds that the OCCA's decision on the Strickland claim is

based on a reasonable determination of the facts presented in state court.

Second, the Court finds that the OCCA reasonably applied Strickland.  When a state court

has adjudicated a Strickland claim, the question for the federal habeas court is not whether trial

counsel's actions were reasonable, but whether the state court reasonably applied Strickland to the

facts of the case.  Richter, 562 U.S. at 105.  And the Supreme Court has made clear that "[t]he

Strickland standard is a general one, so the range of reasonable applications is substantial."  Id.

---

[10] Relying on the state district court's findings, the OCCA stated that trial counsel and Montgomery discussed the strategy of presenting lay witness testimony about Montgomery's behavior to "humanize" Montgomery, and that Montgomery agreed with that strategy.  Dkt. # 15-5, at 5.  In this proceeding, Montgomery claims, and presents an affidavit stating, that he neither discussed this strategy with trial counsel nor agreed to forego calling an expert witness.  Dkt. # 1, at 25, 37.  Critically though, Montgomery did not testify at the evidentiary hearing, and he signed his affidavit in 2017, long after the OCCA rendered its 2010 decision.  When a federal habeas court reviews a claim under the standards set forth in § 2254(d), that review is limited to the record that was presented in state court.  See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); id. at 204 (Alito, J., concurring in part and concurring in the judgment) ("The whole thrust of AEDPA is essentially to reserve federal habeas relief for those cases in which the state courts acted unreasonably.  See §§ 2254(d)(1), (2), (e)(1).  Permitting a petitioner to obtain federal habeas relief on the basis of evidence that could have been but was not offered in state court would upset this scheme."); 28 U.S.C. § 2254(d)(2) (prohibiting grant of habeas relief unless petitioner shows that state court's adjudication of claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding").  The facts presented in state court support the OCCA's decision because trial counsel testified at the evidentiary hearing that he discussed with Montgomery how he would present the theory of defense at trial and that Montgomery agreed with his presentation of the evidence. Dkt. # 16-9, at 55.

Regarding trial counsel's failure to object at trial to the admission of evidence of a prior federal conviction that allegedly was not proven at Montgomery's second preliminary hearing, the OCCA seemingly rested its decision on the deficient-performance prong, reasoning that trial counsel was not ineffective because "the record supports a finding that Montgomery was bound over on this prior conviction at the second preliminary hearing." Dkt. # 15-5, at 5. Arguably, the OCCA's decision could be construed as implicitly determining that Montgomery also failed to establish resulting prejudice. As to the substantive claim challenging the use of the prior federal conviction, the OCCA had previously determined that even if some defect occurred before trial, Montgomery suffered no prejudice because the jury had admissible evidence before it, including Montgomery's own testimony about his prior convictions, to support the jury's finding that Montgomery had two prior felony convictions. Dkt. # 15-5, at 2-3. Regardless of whether the OCCA considered one or both Strickland prongs, it was objectively reasonable for the OCCA to conclude that trial counsel did not provide constitutionally deficient representation by failing to object at trial to the admission of evidence of the prior federal conviction. See e.g., Richter, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated."); Strickland, 466 U.S. at 697 (explaining that reviewing courts can, and often should, "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" rather than addressing "both components of the inquiry if the defendant makes an insufficient showing on one"); Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999) (explaining that an attorney's failure to raise an objection that lacks merit cannot support a finding of prejudice under Strickland).

Regarding trial counsel's failure to call an expert witness, the OCCA largely relied on the state district court's factual findings to conclude that trial counsel did not perform deficiently and instead made an informed and reasonable strategic decision about whether to call an expert witness. Dkt. # 15-5, at 4-5.  In so doing, the OCCA reasonably applied Strickland's guidance that there are "countless ways to provide effective assistance in any given case" and that attorneys have "wide latitude . . . in making tactical decisions."  466 U.S. at 689.  Strickland also clearly advises reviewing courts to "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  Id. at 690.  Lastly, Strickland states that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.  On the facts presented in state court, the OCCA reasonably applied these principles. Couch's testimony supports that he was an experienced criminal defense attorney and that, before Montgomery's trial he consulted a drug court evaluator and did legal research to educate himself about the effects of PCP.  Dkt. # 16-9, at 34-43, 51-52.  Couch testified that he believed that jurors would be familiar with the general effects of PCP from reading or watching the news.  Id. at 38, 42.  He further testified that, in his view, the best evidence of the effects of PCP that were experienced by Montgomery would come in at trial through lay witnesses who would (and did) testify that Montgomery ran into a wall, "was running and swinging his arms wildly and making animalistic sounds," and through the 911 call that captured Montgomery's "unintelligible" and "squealing animalistic sound."  Id. at 39-40, 43-47.  Couch also testified that he thought "there

would be a downside" to presenting an expert witness because an expert could speak more on the violent effects of PCP and Couch "want[ed] the jury to have compassion for Mr. Montgomery." Id. at 40. Couch further testified that an expert witness would have had to rely on observations from lay witnesses to testify about the effects PCP had on Montgomery and an expert would not have been able to testify whether Montgomery had the ability to form specific intent. Id. at 47. Dr. Wallace's testimony on cross-examination confirmed this last point:

> Q.    Now the drug [e]ffects differ in different individuals in different ways; is that right?
>
> A.    Correct.
>
> Q.    Based on body mass, height, weight, that type of thing; is that right?
>
> A.    Yes.
>
> Q.    And again, we still don't know the [e]ffects based on someone of Mr. Montgomery's size and shape; is that right?
>
> A.    That's correct.
>
> Q.    At this point you have no way of telling anyone what the [e]ffect of PCP is on Mr. Montgomery; do you?
>
> A.    Mr. Montgomery specifically?
>
> Q.    Yes, Mr. Montgomery specifically.
>
> A.    Correct.
>
> Q.    You have no way of knowing whether or not Mr. Montgomery can form specific intent while he's under the influence of PCP; do you?
>
> A.    No.
>
> Q.    And you have no way of knowing whether or not anyone can form specific intent under the [e]ffects of PCP without having observed them under the [e]ffects of PCP; is that right?
>
> A.    Well, that's a little bit out of my realm.

Id. at 18-19.  In addition, Couch testified that he thought the best way to show that Montgomery lacked the specific intent to commit maiming was to present testimony from Montgomery about his use of PCP and his lack of recall about the attack on Dees, testimony from lay witnesses about Montgomery's bizarre behavior, and jury instructions not only on the defense of voluntary intoxication but also on the lesser included offense of aggravated assault and battery.  Id. at 47-51. In sum, the testimony from the evidentiary hearing shows that Couch relied on his experience, his knowledge of the evidence that would be presented at trial, and his research about the effects of PCP when he decided not to call an expert witness to testify about the effects of PCP.  Couch's actions exemplify the type of reasoned decision-making that Strickland cautions reviewing courts not to "second-guess" with the benefit of "hindsight" after a defendant has been convicted.  466 U.S. at 689.

To be fair, Montgomery makes a compelling argument that an expert witness could have offered testimony to help the jury understand Montgomery's testimony about his inability to remember attacking Dees.  Dkt. # 1, at 16-26; Dkt. # 20, at 5-8.  Montgomery testified at trial that he recalled his actions before the attack, including details about the clothing he wore and a drink he purchased at the club; that he did not recall leaving the club or attacking Dees; and that he recalled waking up in the ambulance and later waking up in the hospital.  Dkt. # 16-6, at 35-54. And, as Montgomery emphasizes, the state homed in on this testimony during closing arguments. During the state's initial closing argument, the prosecutor discussed the credibility of witnesses and stated:

> And then you've got the defendant, his interests and his bias and his candor. Oh, he was candid with you.  He was candid about how he just smoked up to get high.  That's all he wanted to do.  Oh, he was candid about the details of that day, how he remembered everything else so clearly except for when he attacked a 69 year-old man and a 70 year-old woman.  That magically disappeared.

And he was candid about how he just woke up and was strapped down in the hospital, didn't know what went on. It's amazing how the only part of the night that was missing for him was when he was busy attacking two innocent people on the street. It's up to you to determine the credibility.

Dkt. # 16-6, at 65-68. During that same portion of closing argument, the prosecutor later argued:

The defendant would have you believe that he was so intoxicated by these things that it was impossible for him to intend his acts. He said he smokes all the time. Has smoked marijuana soaked with PCP for years. Has smoked more than three joints a day on numerous occasions, according to his own testimony.

And yet this night he could not have intended his actions. He intended to go to the club, he remembered that. He remembered what he was wearing, who the maker of his shirt was, who the maker of his shoes was, who he danced with, what they looked like, how many dances, what he had to drink but then he couldn't have intended anything else that involved injuring Mr. Dees.

Id. at 72. During the state's final closing argument, the prosecutor again emphasized these same themes, namely, that Montgomery regularly used PCP and chose to get high on the night he attacked Dees, and that Montgomery remembered everything about that night except for violently attacking Dees. Id. at 82-84. After recounting Montgomery's testimony about the details he could remember, the prosecutor stated:

And then, all of a sudden, ladies and gentlemen, he doesn't remember. That's about the time where he would have been out running the streets, attacking innocent 69, 70 year-old people trying to do their job. He doesn't remember that part. That's very convenient for Mr. Montgomery to all of a sudden remember everything up to that point but not remember that part.

Id. at 84. As further discussed below, regarding Montgomery's claim of prosecutorial misconduct, the prosecutor also remarked, "all we've heard Mr. Montgomery say is that, yes, I ingested marijuana and PCP. We've not heard from an expert - -." Id. at 86. This remark was met with a strong objection from trial counsel—"[y]our Honor, I object. We have no burden to present anything. I object to that"—and the trial court sustained that objection. Id. The prosecutor continued, leading to another objection that was overruled:

31

You're only to consider the evidence that was put before you. The [s]tate did not put on an expert to say that he was unable to form a criminal intent to injure someone. Definition, incapable of forming specific intent, the state in which one's mental powers have been overcome through intoxication rendering it impossible to form a criminal intent.

You heard nothing about that. I drink, I've been drunk before. Does that mean that I was so intoxicated that it rendered impossible for me to form a criminal intent? That's what he's asking, Mr. Couch is asking.

MR. COUCH:        Judge, I guess I object. We're not talking about alcohol here, we're talking about PCP dipped in marijuana (sic).

THE COURT:        It's argument, it will stand.

Id. at 86-87. The prosecutor then argued that the jury could consider the lesser included offense of aggravated assault and battery, which does not require specific intent, but further argued that the evidence presented at trial regarding Montgomery's actions demonstrated specific intent and supported a conviction for maiming. Id. at 87-89. The prosecutor once more referred to Montgomery's lack of memory, stating:

Ladies and gentlemen, random act of violence? He knew what he was doing. He had an intent to do it. That's the evidence. That's what's been put before you. Once again, this inability to remember, if that was the case, is there anything here in the instructions that says inability to remember does not equal inability to form a criminal intent? You'll not find an instruction in there that says that.

That's if you believe what Mr. Montgomery is saying, that he doesn't remember the next hour, hour and a half, a convenient period of time when this assault and battery took place, this maiming took place.

Id. at 89. Montgomery contends that the state's efforts to discredit his testimony by emphasizing his inability to remember attacking Dees and the express remark about the lack of an expert witness, demonstrate that trial counsel performed deficiently by failing to call an expert witness to educate the jury about the effects of PCP and he supports this argument with Dr. Wallace's testimony. Dkt. # 1, at 15-26; Dkt. # 20, at 5-8. At the evidentiary hearing, Dr. Wallace testified that PCP was developed "as an anesthetic or dissociative anesthetic agent," that it "does elicit

amnesia," and that its use as a surgical anesthetic for humans was discontinued in the 1950s "because when patients were exiting from surgery, they became very aggressive, combative, disoriented and delusional." Dkt. # 16-9, at 7-9.  More to Montgomery's point, Dr. Wallace further testified about PCP's effect on memory:

> Q.    Now, you indicated that a person under the influence of PCP, they're not supposed to  - - or some type of anesthesia, they're not supposed to feel pain and then it kicks in and they don't remember; is that correct?
>
> A.    In essence, yes.
>
> Q.    In essence.  So the fact that someone allegedly under the influence of this substance would be able to recall very minute details over an extended period of time is not consistent; is that correct?
>
> A.    Actually, it would be consistent.  It would be very similar to someone who is undergoing a long surgical procedure can remember everything leading up to the point when they're prepping them, and then from the prep time to when they show up in recovery, that period of time they don't remember.  That's the amnesia component.
>
> Q.    Okay.  Let me ask another question.  Maybe that wasn't a good question.  If someone, as you've indicated, would have taken PCP and may not be able to remember a particular incident - - do you see where I'm going so far?
>
> A.    Uh-huh.
>
> Q.    But yet can recall very specific details after having ingested PCP is not consistent with the ingestion of PCP.
>
> A.    No, it still would be consistent.  There's a period of time until you reach that level where you're going to experience amnesia, and in a chronic user, it will take a greater amount of drug to reach that level.
>
> Q.    Dr. Wallace, you have no way of informing anyone whether or not Mr. Montgomery's intentionally attached Mr. Dees, the victim, on the night in question; do you?
>
> A.    Excuse me.  I didn't hear the first part.
>
> Q.    You have no way of informing anyone whether or not Mr. Montgomery intentionally or unintentionally attacked the victim, Mr. Dees; do you?
>
> A.    No.

Id. at 20-21.  Undoubtedly, Dr. Wallace's testimony, or testimony from a similarly qualified expert witness, regarding the "amnesia component" of PCP use may have persuaded the jury to find credible Montgomery's testimony that he could not remember attacking Dees.  And expert testimony about this effect of PCP likely could have lessened the impact of (or entirely negated) the state's arguments about his "convenient" memory loss.  But the ultimate question for the jury was not whether Montgomery remembered attacking Dees and gouging out his eye, but whether Montgomery intentionally caused Dees's injury.  Dr. Wallace admitted that neither he nor any expert witness could inform the jury on that question.  Recognizing this information gap, trial counsel reasoned that the better strategy was to forego presenting an expert witness and instead present evidence from lay witnesses and Montgomery describing his use of PCP and his behavior. Considering the testimony from the evidentiary hearing and the evidence presented at trial, the Court finds that it was objectively reasonable for the OCCA to conclude that trial counsel made a reasonably informed strategic decision not to call an expert witness.

For these reasons, § 2254(d) bars relief, and the Court denies the petition as to claim three.

## IV.    Claim four:  prosecutorial misconduct

Montgomery claims that the prosecutor committed misconduct during closing arguments by impermissibly shifting the burden of proof to Montgomery, thereby depriving him of his Fourteenth Amendment right to due process.  Dkt. # 1, at 27-31.  "Ordinarily, a prosecutor's misconduct will require reversal of a state court conviction only where the remark sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process." Duckett v. Mullin, 306 F.3d 982, 988 (10th Cir. 2002) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Parker, 567 U.S. at 45, 48-49 (identifying the fundamental fairness principle from DeChristoforo and Darden v. Wainwright, 477 U.S. 168, 181 (1986), as the clearly

established federal law that governs a prosecutorial misconduct claim and describing this principle as establishing a "highly generalized standard for evaluating claims of prosecutorial misconduct" that provides state courts significant leeway in applying the standard).[11] "An inquiry into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the defendant," Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015), the context in which the challenged remarks were made, Darden, 477 U.S. at 179-82, and the "cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks," Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006).

As he did on direct appeal, Montgomery contends that the prosecutor impermissibly shifted the burden of proof to Montgomery during the state's second closing argument when the prosecutor stated:

> . . . all we've heard Mr. Montgomery say is that, yes, I ingested marijuana and PCP. We've not heard from an expert –

---

[11] When a petitioner alleges that prosecutorial misconduct "effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990). Montgomery relies, in part, on Mahorney to argue that the prosecutorial misconduct alleged here denied him of a specific constitutional right because it impermissibly shifted the burden of proof and "denied him his constitutional entitlement to a presumption of innocence." Dkt. # 1 at 28-31. Respondent concedes that case law supports Montgomery's position. Dkt. # 15, at 29. But the Court declines to accept respondent's concession or to consider whether the alleged misconduct implicates the specific constitutional right Montgomery identifies, thus requiring a different analysis under Mahorney, because Montgomery presented the prosecutorial misconduct claim to the OCCA as one asserting a Fourteenth Amendment due process claim and relied solely on DeChristoforo's fundamental fairness analysis to request relief from the OCCA. Dkt. # 15-1, at 32-35. See 28 U.S.C. § 2254(b)(1)(A) (requiring exhaustion of available state remedies); Grant v. Royal, 886 F.3d 874, 891 (10th Cir. 2018) ("To satisfy exhaustion, then, the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court.").

> [Trial counsel]:        Your Honor, I object.  We have no burden to present anything.  I object to that.

> THE COURT:        Sustained.

> [Prosecutor]:        You're only to consider the evidence that was put before you.  The [s]tate did not put on an expert to say that [Montgomery] was unable to form a criminal intent to injure someone.  Definition, incapable of forming specific criminal intent, the state in which one's mental powers have been overcome through intoxication rendering it impossible to form a criminal intent.

> You heard nothing about that.  There's no evidence presented regarding that.  I drink, I've been drunk before.  Does that mean that I was so intoxicated that it rendered impossible for me to form a  criminal intent?  That's what he's asking, [trial counsel] is asking.

> [Trial counsel]:        Judge, I guess I object.  We're not talking about alcohol here, we're talking about PCP dipped in marijuana (sic).

> THE COURT:        It's argument, it will stand.

Dkt. # 16-6, at 86-87; see Dkt. # 15-1, at .  The OCCA rejected this claim, reasoning:

> Montgomery was not denied a fair trial because of prosecutorial misconduct.  Any error stemming from the prosecutor's argument that Montgomery failed to produce an expert to support his defense was cured by the [trial] court sustaining Montgomery's objection.  See Mack v. State, 2008 OK CR 23, ¶ 9, 188 P.3d 1284, 1289.  The remainder of the prosecutor's argument was within the bounds of argument accepted by this [c]ourt.

Dkt. # 15-5, at 5.  Montgomery contends that the OCCA's decision involves an unreasonable

application of clearly established federal law and is based on an unreasonable determination of the

facts.  Dkt. # 1, at 28-31.  Respondent disagrees, asserting that it was objectively reasonable for

the OCCA to reject Montgomery's due process claim because the alleged misconduct was "an

isolated comment that was met with an objection thereby curing any error."  Dkt. # 15, at 29-32.

Having considered the complained-of statements in the context of the entire trial, the Court

finds that it was objectively reasonable for the OCCA to conclude that they did not impermissibly

shift the burden of proof to Montgomery or otherwise deprive him of due process.  Any potential

prejudice arising from the prosecutor's reference to the absence of an expert witness was

sufficiently cured through:  (1) jury instructions given before closing arguments, advising the jury

(a) that Montgomery "is presumed innocent of the crime charged, and the presumption continues

unless, after consideration of all the evidence, you are convinced of his guilt beyond a reasonable

doubt," (b) that the state "has the burden of presenting the evidence that establishes guilt beyond

a reasonable doubt," (c) that the jury could not find Montgomery "guilty unless the [s]tate produces

evidence which convinces [the jury] beyond a reasonable doubt of each element of the crime," (d)

that "[i]t is the burden of the [s]tate to prove beyond a reasonable doubt that [Montgomery] formed

the specific criminal intent of the crime of [m]aiming," and (e) that the jury must find Montgomery

not guilty of maiming if the jury found "that the State has filed to sustain that burden, by reason

of the intoxication of [Montgomery]," Dkt. # 16-10, at 101, 124;[12] (2) trial counsel's closing

remarks, stating that "[t]he presumption of innocence in this case continues throughout this trial

with respect to until and at last each element has been proven beyond a reasonable doubt" and

arguing that the state had "not proved beyond a reasonable doubt that [Montgomery] intended

specifically the criminal act of maiming," Dkt. # 16-6, at 78; and (3) trial counsel's immediate

objection to the prosecutor's statement about the absence of a defense expert witness, clearly

stating that Montgomery "ha[d] no burden to present anything," that was directly followed by the

trial court's action of sustaining that objection, id. at 86.  See, e.g., Greer v. Miller, 483 U.S. 756,

765-66 (1987) (applying fundamental fairness inquiry and finding no due process violation arising

from prosecutor's "attempt[] to violate the rule of Doyle by asking an improper question in the

presence of the jury" regarding the habeas petitioner's post-arrest silence when the "sequence of

events" in the case involved "a single question, an immediate objection, and two curative

---

[12] Several additional guilt phase jury instructions, including those describing the elements of each crime, advised the jury that it is the state's burden to prove guilt beyond a reasonable doubt. Dkt. # 16-10, at 112, 118-19, 126, 130-31, 133-34.

instructions"); <u>United States v. Gomez-Olivas</u>, 897 F.2d 500, 503-04 (10th Cir. 1990) ("The prosecutor's argument did not shift the burden of proof to the defendant in light of the trial court's subsequent instructions to the jury that arguments of lawyers are not evidence, that the burden of proof is with the government, and that the defendant has no burden to prove innocence, to call witnesses, or to produce any evidence at all."); <u>Moore v. Patton</u>, No. 12-CV-0255-CVE-FHM, 2015 WL 1636574, at *9 (N.D. Okla. Apr. 13, 2015) (unpublished) ("While it is well settled that a prosecutor may not comment on the defendant's exercise of his or her right to remain silent under the Fifth Amendment, <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965), it is equally well settled that a prosecutor 'is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony.'" (quoting <u>Trice v. Ward</u>, 196 F.3d 1151, 1167 (10th Cir. 1999))).

Montgomery also contends that the prosecutor misstated the facts by arguing that there was "no evidence presented regarding" Montgomery's ability to form a criminal intent to injure someone because Montgomery did, in fact, testify that he did not intend to injure Dees. Dkt. # 1, at 30. Even accepting Montgomery's position that the prosecutor misstated the facts shown by the evidence, the Court finds that the misstatement did not, whether considered individually or in conjunction with the comment regarding the absence of an expert witness, so infect the trial as to render it fundamentally unfair. As just discussed, the jury was thoroughly advised about the state's heavy burden to prove the essential elements of each crime beyond a reasonable doubt, including the element of intent to cause injury that was needed to convict Montgomery of maiming. During the state's initial closing argument, trial counsel objected to a different statement that the prosecutor made about the evidence, and the prosecutor clearly stated to the jury: "Nothing that I say or Mr. Couch says is evidence. You all heard it and I'm trying my best to remember it the same as you will." Dkt. # 16-6, at 69-70. In addition, trial counsel's closing argument carefully

pointed out the evidence from witnesses who described Montgomery's behavior, discussed the evidence from Montgomery who described his use of PCP and how it affected him, and argued that the evidence "clearly" established reasonable doubt as to whether the state met its burden to prove that Montgomery intended to cause injury.  Id. at 73-80.

Based on the foregoing, Montgomery has not shown that any fairminded jurists, considering the challenged comments in context of the entire proceeding, would disagree with the OCCA's determination of the facts or with its application of the law that resulted in a decision to reject Montgomery's prosecutorial misconduct claim.  Section 2254(d) therefore bars relief, and the Court denies the petition as to claim four.

**V.    Claim five:  improper response to jury question**

Montgomery claims "that the [trial] court improperly answered questions from the jury during deliberations while neither he nor his counsel [was] present in violation of clearly established law and that the answer was not harmless beyond a reasonable doubt." Dkt. # 1, at 31; Dkt. # 20, at 11.  "One of the most basic of the rights guaranteed by the Confrontation Clause of the Sixth Amendment is the accused's right to be present at every stage of his trial." Ellis v. Oklahoma, 430 F.2d 1352, 1354 (10th Cir. 1970) (citing Illinois v. Allen, 397 U.S. 337 (1970)); see also United States v. Carter, 973 F.2d 1509, 1515 (10th Cir. 1992) ("The right of the accused to be present during all critical stages of the trial is basic and fundamental." (citing Rushen v. Spain, 464 U.S. 114, 117 (1983))).  The Carter court stated:

> This basic right is further protected by FED. R. CRIM. P. 43 which requires the presence of the defendant "at every stage of the trial." See Rogers v. United States, 422 U.S. 35, 39, 95 S. Ct. 2091, 2094, 45 L. Ed. 2d 1 (1975).  A question from the jury must be answered in open court and only after providing counsel an opportunity to be heard.  Id.; United States v. de Hernandez, 745 F.2d 1305, 1310 (10th Cir. 1984).  We generally presume prejudice any time an improper ex parte communication occurs between a juror and the trial judge.  United States v. McDonald, 933 F.2d 1519, 1524 (10th Cir.), cert. denied, 502 U.S. 897, 112 S. Ct.

> 270, 116 L. Ed. 2d 222 (1991).  A trial court's considerate desire to avoid keeping
> a jury waiting is not a sufficient reason to deprive a defendant of his dual right to
> be present and to be heard.

Carter, 973 F.2d at 1515.  Nonetheless, even when constitutional errors occur in this context, the errors may be held harmless.  Id.

The facts relevant to this claim are straightforward.  As previously discussed, during jury deliberations, the jury sent a note asking the trial court to "define intent."  Dkt. # 16-7, at 11.  The trial court responded, in writing, "You have all the law and evidence necessary to reach a verdict." Id.  Nothing in the record indicates that the trial court consulted with the parties before it answered this question or that the trial court brought the jury into the courtroom before providing the written response.  Dkt. # 16-6, at 91-92.  On direct appeal, Montgomery argued that the trial court's response resulted in procedural and substantive errors that violated state law and the Fourteenth Amendment.  Dkt. # 15-1, at 16-21.  First, Montgomery argued that the trial court procedurally erred by responding to the jury's question without consulting trial counsel or calling the jury into the courtroom, in violation of Okla. Stat. tit. 22, § 894 and state court decisions interpreting that statute.  Dkt. # 15-1, at 17-19.  Second, Montgomery argued that the trial court substantively erred by referring the jury back to the instructions and refusing to define "intent" because the jury's confusion about the meaning of the word "intent," when intent was the critical issue for the charge of maiming, likely (1) prevented the jury from unanimously finding the element of intent proven beyond a reasonable doubt, in violation of the Fourteenth Amendment, as interpreted in Winship; (2) resulted in the failure to instruct the jury in a way that the jury could understand the instructions, in violation of the Fourteenth Amendment, as interpreted in Cupp v. Naughten, 414 U.S. 141 (1973); and (3) resulted from the trial court's failure to consider the plain language of the statute criminalizing maiming that uses the phrase "premeditated design to injure another" rather than the term "intent."  Id. at 19-21.

The OCCA rejected Montgomery's claim, reasoning:

> There is nothing in the record to show that the district court brought the jury into the courtroom and complied with 22 O.S. 2001, § 894 in responding to the jury's question during deliberations about the meaning of intent. Violations of section 894 may be harmless where on the face of the record no prejudice to the defendant occurred. See Smith v. State, 2007 OK CR 16, ¶ 52, 157 P.3d 1155, 1172; Cipriano v. State, 2001 OK CR 25, ¶ 69, 32 P.3d 869, 879.

> Montgomery's jury was given the uniform instructions on maiming and the defense of voluntary intoxication. The instructions provided that voluntary intoxication was a defense to maiming, that the crime of maiming requires the specific criminal intent to cause injury, and that a person should be found not guilty if that person could not form the specific criminal intent because of intoxication caused by drugs. The court's response directed the jury back to these instructions which explained the requirement of intent to injure and the law on Montgomery's voluntary intoxication defense. The instructions also included a definition for "incapable of forming specific criminal intent." [Footnote omitted.] The instructions, read as a whole, made clear the meaning of intent and the need for the jury to find that Montgomery intentionally inflicted disfiguring injury before it could convict him of maiming. Referring the jury back to the instructions was an appropriate response in this case and we find that no relief is required.

Dkt. # 15-5, at 2-3. Montgomery mainly reasserts the arguments that he raised on direct appeal but he appears to present one new one—namely, that the trial court's violation of Okla. Stat. tit. 22, § 894 also violated clearly established federal law governing responses to jury questions, as described in Rogers, Carter, and de Hernandez. Dkt. # 1, at 31-35; Dkt. # 20, at 11. Respondent contends relief is not available as to this claim because: (1) none of Montgomery's arguments mentions, much less addresses, the OCCA's adjudication of this claim; (2) this claim alleges only an error of state law that is not cognizable on federal habeas review; and (3) that, to the extent Montgomery identifies a cognizable federal claim, § 2254(d) bars relief because the OCCA reasonably determined that the trial court's response to the jury's question did not deprive Montgomery of a fundamentally fair trial. Dkt. # 15, at 31-38. For several reasons, the Court finds that federal habeas relief is not warranted.

First, to the extent Montgomery's arguments could be construed, in part, as reasserting his claim that the trial court violated state law by responding to the jury's question without consulting trial counsel, without responding in open court, and without requiring Montgomery's presence, the Court agrees with respondent that claim five alleges only an error of state law that cannot be remedied through this habeas action.  See Pulley, 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Second, to the extent Montgomery's arguments could be construed, in part, as asserting a constitutional error based on the failure to respond to the jury's question in open court and in the presence of Montgomery, the OCCA's decision sufficiently explains why that constitutional error, if it occurred, was harmless.   Montgomery conceded on direct appeal, and restates in this proceeding, that the jury instructions "fairly and accurately stated the law."  Dkt. # 1, at 34; Dkt. # 15-1, at 20.  As the OCCA reasoned, "[r]eferring the jury back to the instructions was an appropriate response in this case" because the instructions that were given to the jury adequately guided the jury on the issue of intent.  Dkt. # 15-5, at 3.  The record amply supports the OCCA's reasoning, and the Court finds that no fairminded jurists considering the facts of this case would disagree with the OCCA's determination, to the extent a constitutional error occurred, it was harmless.  See, e.g., Carter, 973 F.2d at 1515-16 (finding constitutional error based on trial court's failure to respond to jury question in open court after consultation with counsel, but concluding that error was harmless because "the trial court's response simply reiterated its previous instruction" and the response "was substantially identical to the court's previous jury instructions given in the presence of [the defendant] and his counsel"); Folks v. Mullin, Case No. 09-CV-0786-GKF-TLW, 2013 WL 162337, at *4 (N.D. Okla. Jan. 15, 2013) (unpublished) (rejecting a habeas petitioner's argument that a trial court improperly responded to jury question about charge to be

proven; finding appropriate the trial court's response that the jury had "all the law and evidence necessary to reach a verdict"; and concluding that the petitioner failed to show that the OCCA's decision was objectively unreasonable).

Third, to the extent Montgomery argues that "[t]he jury's admitted lack of understanding as to the meaning of 'intent' calls into question the validity of [his] conviction for maiming," the Court rejects that argument. Dkt. # 1, at 35. This Court previously considered Montgomery's challenge to the sufficiency of the evidence. See supra, discussion section I. Building on that analysis, and considering the jury's verdict in light of the instructions that were given, the Court finds nothing objectively unreasonable about the OCCA's determination that the trial court's failure to further define the term "intent" was harmless.

For these reasons, and regardless of whether the Court applies § 2254(d) or reviews this claim de novo, the Court finds that federal habeas relief is not warranted. The Court therefore denies the petition as to claim five.

### *CONCLUSION*

For the reasons stated, the Court concludes that Montgomery has not met his burden to show that federal habeas relief is warranted. The Court therefore denies the petition as to all claims raised therein. Further, the Court concludes that reasonable jurists would not debate the correctness of the Court's assessment of Montgomery's constitutional claims. The Court therefore declines to issue a certificate of appealability as to any claims. See 28 U.S.C. § 2253; Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1. the Clerk of Court shall note the substitution of James Cotton, Interim Warden, in place of Scott Crow as party respondent;

2.   the petition for writ of habeas corpus (Dkt. # 1) is **denied**;

3.   a certificate of appealability is **denied**;

4.   a separate judgment shall be entered in this matter.

**DATED** this 20th day of May, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE